1
2
3
4
5
6
7
8
9
10

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

11

12

13

14

15

16

17

| | | |
|---|---|---|
| RUBEN OROS FRANCO, | ) | NO. EDCV 11-1473 SS |
| Plaintiff, | ) | |
| v. | ) | **MEMORANDUM DECISION AND ORDER** |
| MICHAEL J. ASTRUE,<br>Commissioner of Social Security, | ) | |
| Defendant. | ) | |

18

19

20                                    **I.**

21                              **INTRODUCTION**

22

23        Plaintiff Ruben Oros Franco ("Plaintiff") brings this action
24 seeking to overturn the decision of the Commissioner of the Social
25 Security Administration (hereinafter the "Commissioner" or the "Agency")
26 who denied his Title II application for a period of disability and
27 disability insurance benefits.  This matter is before the Court after
28 both    parties    consented    to    proceed    before    the
//

undersigned United States Magistrate Judge.   For the reasons stated below, the decision of the Commissioner is REVERSED and REMANDED for payment of benefits.

## II.

### PROCEDURAL HISTORY

On June 23, 2009, Plaintiff filed a Title II application for a period of disability and disability insurance benefits. (Administrative Record ("AR") 22).[1]  The claim was initially denied on August 26, 2009. (AR 74-77).   On December 24, 2009, the claim was denied upon reconsideration.  (AR 79-82).  On January 14, 2010, Plaintiff filed a written request for a hearing before an Administrative Law Judge ("ALJ").   (AR 84-85).   On November 10, 2010, ALJ Sharilyn Hopson conducted the hearing.  (AR 40-71).   Troy Scott, a vocational expert, also testified at the hearing.  (AR 64-71).  On December 21, 2010, the ALJ issued an unfavorable decision.  (AR 19-34).   Plaintiff requested review of the ALJ's decision by the Appeals Council on January 21, 2011. (AR 17-18).  The Appeals Council denied review on July 22, 2011.  (AR 1-3).  The ALJ's decision became the final decision of the Commissioner. Plaintiff then filed the instant action on September 14, 2011.

//

//

//

//

---

[1] This does not appear in the record, but is mentioned in the ALJ's decision.   (AR 22).

**III.**

**FACTUAL BACKGROUND**

Plaintiff was born in Tijuana, Mexico on February 6, 1959.  (AR 125, 548).  Plaintiff moved to the United States at age twenty-four. (AR 548).  Plaintiff was fifty years old as of December 31, 2009, the date last insured.  (AR 125).  Plaintiff was fifty-one years old as of the date of the ALJ's decision, December 21, 2010.  (AR 19-34). Plaintiff completed school through fourth or fifth grade in Mexico.  (AR 48).  He speaks some English, but his primary language is Spanish.  (AR 48, 128). Plaintiff's past work experience includes work as a machine operator and product assembler. (AR 162, 214).  Plaintiff claims he is unable to work due to pain in his back, right arm, shoulders and depression.  (AR 46, 129).

**A.   Relevant Medical History**

Plaintiff stated that he originally injured his elbow in 1995. (AR 176).  Plaintiff continued to work with the injury until 2000.  (AR 124).  Since 2000, Plaintiff has had multiple surgeries on his left and right shoulders. (AR 713).  In 2004, Plaintiff fell and injured his back.  (AR 539).  During the time from 2001 to 2005, Plaintiff was not earning an income.  (AR 124).  However, beginning in 2006 until 2009, Plaintiff resumed work and did earn income.  (AR 124, 162).  However, Plaintiff alleges that it became increasingly more difficult for him to work because his pain was constant.  (AR 62, 129).  This caused him to take pain medication while on the job which would negatively effect his //

3

productivity and memory.   (AR 62).   Therefore, on May 27, 2009, Plaintiff stopped working.   (AR 63, 129).

### 1.   Plaintiff's Treating Physicians

   a.   Dr. McSweeney

Dr. McSweeney, an orthopedic specialist, first examined Plaintiff on October 25, 2000.  (AR 266-67).  Dr. McSweeney has performed multiple surgeries on Plaintiff.  On September 19, 2003, Dr. McSweeney performed the following procedures on Plaintiff's right shoulder: a resection of a superior labral tear with repair to the superior labrum SLAP lesion, debridement of the rotator cuff and anthroscopic mumford procedure.  (AR 376).  On April 9, 2008, Dr. McSweeney performed an arthroscopy of the left shoulder with a partial labrectomy.  (AR 532).  Further, on July 22, 2009, Dr. McSweeney conducted another arthroscopy of the left shoulder with a repair of the superior labrum and rotator cuff debridement.  (AR 580).

Dr. McSweeney completed a Multiple Impairment Questionnaire on October 7, 2010.  (AR 738-45).  Dr. McSweeney diagnosed Plaintiff's right shoulder with an impingement, rotator cuff tendonosis and labral tear.  (AR 738).  Dr. McSweeney assessed that Plaintiff's left shoulder suffers from a bicep tendon tear, rotator cuff tear, labral tear, adhesive capsulitis, chronic cervical sls and DPD.  (Id.).  Further, Dr. McSweeney found that Plaintiff's right elbow has lateral epicondylitis.  (Id.).  To come to this diagnosis, Dr. McSweeney relied on previous medical tests, such as a right shoulder MRI from June 24, 2010, nerve

4

studies from June 18, 2010, a left shoulder MRI from March 5, 2007 and intra-operative findings from the last surgery he performed on Plaintiff on July 22, 2009.  (AR 321-24, 580-82, 665, 739).

Dr. McSweeney opined that with Plaintiff's symptoms and limitations, Plaintiff could sit for three hours in an eight-hour workday and stand or walk for three hours in an eight-hour workday.  (AR 740-41).  Dr. McSweeney also determined that Plaintiff could lift and carry up to ten pounds occasionally; cannot perform work above shoulder level; is moderately limited in grasping, turning and twisting objects; is moderately limited in using his fingers or hands for fine manipulations; and is markedly limited in using his arms for reaching. (AR 741-42).  Dr. McSweeney also found that Plaintiff suffers from depression and is in constant pain.  (AR 743).  Overall, Plaintiff is unable to do a full time competitive job.  (Id.).  Dr. McSweeney noted that "patient has a chronic condition and will not improve.  To some degree it has worsened."  (AR 744).

    b.  Dr. Madrid

Dr. Madrid, who practices family medicine, first examined Plaintiff in 2005.  (AR 459, 465-67).  Dr. Madrid completed a Multiple Impairment Questionnaire on March 24, 2010.  (AR 632-39).  Dr. Madrid diagnosed Plaintiff with severe depression due to chronic pain from work related injuries.  (AR 632).  He also assessed memory loss associated with depression in reference to a neurology consult which revealed pseudo dementia.  (Id.).  Dr. Madrid opined that Plaintiff cannot sit or stand for more than thirty minutes at one time during an eight-hour workday

due to his low back pain. (AR 634). Dr. Madrid also determined that Plaintiff can occasionally lift and carry up to five pounds; is moderately limited in grasping, turning and twisting with his left side; is moderately limited in using his fingers and hands for fine manipulations; and is markedly limited in using his arms for reaching. (AR 635-36). Ultimately, Plaintiff cannot do a full time competitive job and has constant pain. (AR 637).

      c.  Dr. Abshire

Dr. Abshire is a doctor at the spine and neurosurgery clinic. (AR 613). Dr. Abshire first saw Plaintiff in March 2009. (AR 614). Dr. Abshire examined Plaintiff's back and reported disk narrowing at L5-S1, partial lumbarization of S1 with spina bifida occulta and a lateral disk herniation at L3-4. (AR 613). Dr. Abshire recommended a foraminal root block in Plaintiff's back, but noted that doing this procedure may prove difficult due to Plaintiff's insurance policy. (Id.). In January 2010, Plaintiff's lateral disc protrusion at L3-4 had decreased in size, but there was a broad-based disc bulge at L4-5. (AR 608). Dr. Abshire ultimately decided not to recommend surgery because "the chance of making [Plaintiff] better and substantially better is low." (Id.).

      d.  Dr. Alvarez

Dr. Alvarez, a neurologist, first examined Plaintiff on June 18, 2009. (AR 317). Dr. Alvarez diagnosed Plaintiff with progressive cognitive decline, depression and anxiety. (Id.). In July and November 2009, she added pseudo-dementia and multiple orthopedic injuries with

1  chronic pain to her prognosis.  (AR 598, 602).  In January 2010, Dr.
2  Alvarez reported that Plaintiff had not contacted a psychiatrist for
3  treatment of his depression and was returning to his primary physician
4  for a referral.  (AR 604).

6          e.   Dr. Chesler

8      Dr. Chesler, a specialist in physical medicine and rehabilitation,
9  first saw Plaintiff in January 2010.  (AR 713).   In his initial
10  examination of Plaintiff, Dr. Chesler diagnosed a shoulder impingement,
11  radiculopathy lumbar and numbness paresthesia of the skin.  (AR 716).
12  On October 31, 2010, Dr. Chesler completed a Multiple Impairment
13  Questionnaire.  (AR 835-42).  Dr. Chesler provided the same diagnosis
14  and offered medical evidence, such as the July 22, 2009 surgery and a
15  diagnostic ultra sound showing a tear from September 2010 to support his
16  findings. (AR 835-36).  Dr. Chesler opined that Plaintiff cannot sit or
17  stand for more than one hour at a time during an eight-hour work day.
18  (AR 837).  Plaintiff also can lift and carry no more than five pounds
19  and occasionally lift and carry up to ten pounds; is moderately limited
20  in grasping, turning and twisting; has no limitations when using his
21  fingers or hands; and is markedly limited in reaching with his arms. (AR
22  838-39).  Plaintiff suffers from depression "due to job income loss."
23  (AR 840).  Dr. Chesler determined that Plaintiff cannot perform a full
24  time competitive job.  (Id.).
25  //
26  //
27  //
28  //

1          f.   Dr. Maloff

2

3     Dr. Maloff, a psychiatrist, first examined Plaintiff on May 5, 2010
4  after a referral from Dr. McSweeney.  (AR 653).  In Dr. Maloff's initial
5  report, he described that Plaintiff is depressed and "devastated as a
6  result of his inability to return to work."  (AR 654).  Dr. Maloff also
7  reported that Plaintiff asks himself, "[i]s it time for me to end my
8  life?"  (Id.).

9

10    Dr.  Maloff  completed  a  Psychiatric/Psychological  Impairment
11 Questionnaire on September 7, 2010.  (AR 669-76).  Dr. Maloff diagnosed
12 Plaintiff with major depressive illness and multiple orthopedic injuries
13 causing him pain.  (AR 669).  Dr. Maloff reported clinical findings of
14 poor memory, sleep disturbance, mood disturbance, social withdrawal,
15 psychomotor  agitation  or  retardation,  feelings  of  guilt  and  suicidal
16 ideation among other findings.  (AR 670).  Dr. Maloff determined that
17 Plaintiff is markedly limited in remembering detailed instructions and
18 being able to carry out those instructions.  (AR 672).  Dr. Maloff
19 opined that Plaintiff is also markedly limited in being able to complete
20 a  work  week  without  interruptions  from  psychological  symptoms.   (AR
21 673).  Further, Plaintiff is incapable of handling even low stress in a
22 work environment.  (AR 675).

23

24          g.   Dr. Wachtmann

25

26    Dr. Wachtmann, a psychologist, first examined Plaintiff in May
27 2010. (AR 746).  Dr. Wachtmann completed two Psychiatric/Psychological
28 Impairment Questionnaires on October 12, 2010 and January 28, 2011.  (AR

746-53, 894-901).  In both questionnaires, Dr. Wachtmann diagnosed Plaintiff with a pain disorder, as well as psychological factors and major depression.  (AR 746, 894).  The clinical findings proffered for support in the October questionnaire included poor memory, sleep disturbance, mood disturbance, social withdrawal, isolation, psychomotor agitation or retardation, feelings of guilt and suicidal ideation, among other findings.  (AR 747).  Dr. Wachtmann's questionnaire in January listed these findings and more, such as loss of intellectual ability of fifteen IQ points or more, recurrent panic attacks, difficulty thinking or concentrating and generalized persistent anxiety.  (AR 895).  Dr. Wachtmann opined that Plaintiff is markedly limited in the ability to understand and carry out detailed instructions.  (AR 749).  Plaintiff is only capable at most of tolerating low stress in a work environment. (AR 900).  Dr. Wachtmann explained that Plaintiff has constant pain (AR 753), and that Plaintiff's "psychical inability to work significantly exacerbates his depression."  (Id.).

h.   Dr. Dhalla

Dr. Dhalla, an orthopedic specialist, on June 28, 2010, performed a medical re-examination of Plaintiff for Plaintiff's worker's compensation claim.  (AR 845-52).  An interpreter provided translation throughout the examination.  (AR 845).  Dr. Dhalla diagnosed Plaintiff's right elbow with epicondylectomy and extensor release; Plaintiff's left shoulder with arthroscopy with subacromial decompression, mumford procedure and biceps tenodesis; and Plaintiff's right shoulder with subacromial decompression.  (AR 849).  Concerning Plaintiff's work restrictions, Dr. Dhalla determined that Plaintiff's disability to his

9

right elbow would preclude him from heavy lifting, firm gripping and firm grasping with his right hand.  (AR 850).  Dr. Dhalla assessed that Plaintiff's disability to his right shoulder would preclude him from heavy lifting and performing work above shoulder level with the right upper extremity.  (Id.).  Dr. Dhalla also determined that Plaintiff's disability to his left shoulder would preclude him from heavy lifting and performing work above shoulder level.  (Id.).  Although Plaintiff has these noted limitations, Dr. Dhalla opined that Plaintiff had successfully rehabilitated himself.  (AR 851).

**B.   Consultative Examinations**

     **1.   Dr. Sophon**

     Dr. Sophon, an orthopedic consultant for the Agency, performed the first of three consultative examinations of Plaintiff during a twelve day period.  (AR 539-45).  Dr. Sophon examined Plaintiff on August 6, 2009.  (Id.).   Concerning Plaintiff's left shoulder, Dr. Sophon diagnosed a rotator cuff tear, multiple operative repairs and decompression procedures.  (AR 544). Regarding Plaintiff's right elbow, Dr. Sophon assessed operative release for lateral epicondylitis.  (Id.).  Dr. Sophon also determined that Plaintiff had a lumbosacral strain.  (Id.).  Dr. Sophon was unable to examine the range of motion in Plaintiff's left shoulder because Plaintiff was wearing a left shoulder immobilizer from his recent surgery in July 2009.  (AR 542).   Dr. Sophon opined that Plaintiff could lift and carry twenty pounds occasionally and ten pounds frequently; sit, stand and walk six hours in

an eight-hour workday; and frequently reach but could not do above shoulder level work with his left arm.  (AR 544).

### 2.   Dr. Pierce

Dr. Pierce, a psychological consultant for the Agency, examined Plaintiff on August 14, 2009.  (AR 547-52).  An interpreter translated during the evaluation.  (AR 547).  Dr. Pierce diagnosed Plaintiff to be malingering because of an exaggeration of intellectual, memory and attention deficits.  (AR 551).  Dr. Pierce also determined that Plaintiff has a mood disorder with significant anxious and depressive signs; borderline-to-higher intellectual functioning even though Plaintiff dramatically under-performed in the testing; and orthopedic injuries.  (Id.).  Dr. Pierce determined that Plaintiff "does not perform to his capacities with mental evaluation" because he gave a "reasonable complaint verbal history, [and then Plaintiff] proceeds to rather dramatically fail simple testing tasks, such as recalling words." (Id.).  Dr. Pierce also noted that Plaintiff's long-term memory was "fairly adequate," but his short-term memory was "poorly demonstrated." (AR 549).  Ultimately, Dr. Pierce concluded that Plaintiff could comply with simple one and two part instructions and could concentrate for a regular work schedule.  (AR 551).

### 3.   Dr. VuDo

Dr. VuDo, a medical consultant for the Agency, conducted the Physical Residual Functional Capacity Assessment on August 17, 2009.

(AR 553-60).  Dr. VuDo determined that Plaintiff can occasionally lift and carry twenty pounds; frequently lift and carry ten pounds; stand and walk for six hours in an eight-hour workday; sit for six hours in an eight-hour workday; and can unlimitedly push and pull.  (AR 554). Plaintiff is also limited in reaching but unlimited in handling, fingering and feeling.  (AR 555).

**4.  Dr. Landau**

Dr. Landau is a medical expert who testified at the ALJ hearing. (AR 49-57).  Dr. Landau, after reviewing the medical records but not personally examining Plaintiff, diagnosed Plaintiff with repetitive trauma injuries to both shoulders and right elbow with persistent pain, degenerative disease of the lumbosacral spine, low back pain and psychiatric conditions.  (AR 50).  Dr. Landau opined that Plaintiff can stand or walk for two hours in an eight-hour workday; sit for six hours in an eight-hour workday with a provision to be able to take normal breaks to stand and stretch his knee; lift and carry ten pounds frequently and twenty pounds occasionally; occasionally stoop and bend; cannot climb ladders; cannot work above shoulder level on either side; cannot forcefully grasp, grip, push, pull or twist; and can occasionally clutch with the right elbow.  (AR 55).

**C.  Plaintiff's Testimony**

Plaintiff testified that he last worked in May 2009.  (AR 45). Plaintiff explained that he stopped working because he "had operations and [he] just couldn't take any more of the pain."  (AR 46).  When

12

working and in pain, Plaintiff would take pain medication, but this would have a negative effect on his work product and memory. (AR 62). Plaintiff described that he is in constant pain in his arms and back. (AR 46). It is the pain and his depression that keeps him from working. (Id.). Plaintiff is suicidal and goes to therapy. (AR 58). Plaintiff's medication makes him feel dizzy or that "everything goes blank." (AR 61).

Plaintiff was born in Mexico and completed fourth or fifth grade there. (AR 48). Plaintiff is able to speak English "a bit" because he learned from "speaking to people." (AR 48). When asked if he writes in English, Plaintiff stated, "[a] little bit yes, but I don't write it -- I write it in my form of Spanish." (AR 64).

Plaintiff's typical day includes taking medication for pain and depression, watching television, some walking and sleeping. (AR 59). However, when Plaintiff watches television, he forgets what he has been watching. (AR 60). Plaintiff is able to bathe and dress himself but is not able to assist his family with housework, yard work or cooking. (AR 59). When Plaintiff is feeling well enough, he attends church. (AR 60).

**D.   Vocational Expert's Testimony**

Troy Scott, a vocational expert ("VE"), assessed and analyzed Plaintiff's past work experience according to the Dictionary of Occupational Titles ("DOT"). (AR 65-70). The VE determined that Plaintiff had worked as a machine operator from 1986-2000 and as a

1  medical products assembler from 2006-2009.  (AR 66).  In the first
2  hypothetical posed to the VE, it was assumed that Plaintiff could speak
3  English, stand or walk two hours in an eight-hour workday, sit six hours
4  in an eight-hour workday, lift and carry ten pounds frequently and
5  twenty pounds occasionally and not work above shoulder level.  (AR 66).
6  Based on these limitations, the VE determined that Plaintiff could not
7  perform his past work.  (AR 67).  However, Plaintiff could perform jobs
8  in the national economy, such as a parking lot booth attendant,
9  electronics worker and sewing machine operator.  (AR 67).  In the second
10 hypothetical posed to the VE, Plaintiff had these same limitations
11 except that Plaintiff would not be able to speak, read or write English.
12 (AR 67-68).  The VE testified that in this hypothetical, Plaintiff would
13 not be able to work as a parking lot booth attendant, but would still be
14 able to work as an electronics worker or sewing machine operator.
15 (Id.).  However, if Plaintiff would have to be absent three days or more
16 per month, Plaintiff would not be able to find competitive employment.
17 (AR 69).

18
19                                   IV.
20                    THE EVALUATION OF DISABILITY
21
22     To qualify for disability benefits, a claimant must demonstrate  a
23 medically determinable physical or mental impairment that prevents him
24 from engaging in substantial gainful activity[2] and that is expected to
25 result in death or to last for a continuous period of at least twelve
26  _____
27     [2]   Substantial gainful activity means work that involves doing
   significant and productive physical or mental duties and is done for pay
28 or profit.  20 C.F.R. §§ 404.1510, 416.910.

months.  Reddick v. Chater, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)).  The impairment must render the claimant incapable of performing the work he previously performed and incapable of performing any other substantial gainful employment that exists in the national economy.  Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry.  20 C.F.R. §§ 404.1520, 416.920.  The steps are:

(1)   Is the claimant presently engaged in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.

(2)   Is the claimant's impairment severe?  If not, the claimant is found not disabled.  If so, proceed to step three.

(3)   Does the claimant's impairment meet or equal one of a list of specific impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1?  If so, the claimant is found disabled.  If not, proceed to step four.

(4)   Is the claimant capable of performing his past work?  If so, the claimant is found not disabled.  If not, proceed to step five.

(5)   Is the claimant able to do any other work?  If not, the claimant is found disabled.  If so, the claimant is found not disabled.

Tackett, 180 F.3d at 1098-99; see also Bustamante v. Massanari, 262 F.3d

15

1  949, 953-54 (9th Cir. 2001) (citations omitted); 20 C.F.R. §§
2  404.1520(b)-(g)(1) & 416.920(b)-(g)(1).

3

4      The claimant has the burden of proof at steps one through four, and
5  the Commissioner has the burden of proof at step five.  Bustamante, 262
6  F.3d at 953-54.  If, at step four, the claimant meets his burden of
7  establishing an inability to perform past work, the Commissioner must
8  show that the claimant can perform some other work that exists in
9  "significant numbers" in the national economy, taking into account the
10  claimant's residual functional capacity ("RFC"),[3] age, education, and
11  work experience.  Tackett, 180 F.3d at 1098, 1100; Reddick, 157 F.3d at
12  721; 20 C.F.R. §§ 404.1520(g)(1), 416.920(g)(1).  The Commissioner may
13  do so by the testimony of a vocational expert or by reference to the
14  Medical-Vocational Guidelines appearing in 20 C.F.R. Part 404, Subpart
15  P, Appendix 2 (commonly known as "the Grids").  Osenbrock v. Apfel, 240
16  F.3d 1157, 1162 (9th Cir. 2001).  When a claimant has both exertional
17  (strength-related) and nonexertional limitations, the Grids are
18  inapplicable and the ALJ must take the testimony of a vocational expert.
19  Moore v. Apfel, 216 F.3d 864, 869 (9th Cir. 2000).

20

21                              **V.**

22                        **STANDARD OF REVIEW**

23

24      Under 42 U.S.C. § 405(g), a district court may review the
25  Commissioner's decision to deny benefits.  The court may set aside the

26  _____

27      [3]    Residual functional capacity is "what [one] can still do
   despite [his] limitations" and represents an "assessment based upon all
28  of the relevant evidence."  20 C.F.R. §§ 404.1545(a), 416.945(a).

                              16

1  Commissioner's decision when the ALJ's findings are based on legal error

2  or are not supported by substantial evidence in the record as a whole.

3  Aukland v. Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001); Smolen v.

4  Chater, 80 F.3d 1273, 1279 (9th Cir. 1996).

5

6      "Substantial evidence is more than a scintilla, but less than a

7  preponderance." Reddick, 157 F.3d at 720. It is "relevant evidence

8  which a reasonable person might accept as adequate to support a

9  conclusion." (Id.). To determine whether substantial evidence supports

10 a finding, the court must "'consider the record as a whole, weighing

11 both evidence that supports and evidence that detracts from the

12 [Commissioner's] conclusion.'" Aukland, 257 F.3d at 1035 (quoting Penny

13 v. Sullivan, 2 F.3d 953, 956 (9th Cir. 1993)). If the evidence can

14 reasonably support either affirming or reversing that conclusion, the

15 court may not substitute its judgment for that of the Commissioner.

16 Reddick, 157 F.3d at 720-21.

17

18                                **VI.**

19                        **THE ALJ'S DECISION**

20

21      The ALJ relied on the five-step evaluation process to conclude that

22 Plaintiff is not disabled. The ALJ determined that Plaintiff engaged in

23 substantial gainful activity from January 2000 to May 2009. (AR 24).

24 However, there was a continuous twelve month period during which

25 Plaintiff did not engage in substantial gainful activity. (Id.). The

26 ALJ found that Plaintiff has severe impairments of repetitive trauma

27 injuries to both shoulders and right elbow with persistent pain, despite

28 several arthroscopic operations; degenerative disc disorder of the

17

lumbosacral spine with chronic low back pain; mood disorder; and anxiety. (AR 25). The ALJ concluded that these impairments do not meet one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Id.).

The ALJ found that Plaintiff has the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b). (AR 26). The ALJ specified that Plaintiff is restricted to standing or walking for two hours in an eight-hour workday; sitting for six hours in an eight-hour workday with normal breaks every two hours to stand and stretch for one to three minutes; lifting and carrying ten pounds frequently and twenty pounds occasionally; occasionally stooping and bending; occasionally flexing or extending the right elbow with no restriction for the left elbow; doing simple and repetitive tasks; cannot climb ladders, climb stairs, work at heights, balance or work above shoulder level; and cannot forcefully grip, grasp, push, pull or twist. (Id.). Further, Plaintiff could communicate in English. (AR 33). Finally, the ALJ determined that Plaintiff could not perform his past work. (AR 32). Therefore, after taking into account the VE's testimony, the ALJ concluded that Plaintiff could perform light work in the national economy. (AR 33). This light work included working as a parking lot booth attendant, electronics worker or sewing machine operator. (AR 33-34). Accordingly, the ALJ found that Plaintiff is not disabled. (AR 34).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**VII.**

**DISCUSSION**

Plaintiff contends that the ALJ erred by (1) rejecting the opinions of Plaintiff's treating physicians without providing specific and legitimate reasons; (2) rejecting Plaintiff's pain testimony without clear and convincing reasons; and (3) failing to follow Medical-Vocational Rule 202.09. (Plaintiff's Memorandum in Support of Complaint at 10, 14, 16). The Court agrees with Plaintiff's contentions.

**A.    The ALJ Failed To Provide Specific And Legitimate Reasons To Reject The Treating Physicians' Opinions**

The opinions of a treating physician are entitled to special weight because the treating physician is hired to cure and has a better opportunity to know and observe the claimant as an individual. Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989). "Where a treating physician's opinion is not contradicted by another doctor, it may be rejected only for clear and convincing reasons." Connett v. Barnhart, 340 F.3d 871, 874 (9th Cir. 2003). However, if the treating physician's opinion is contradicted, the opinion may be rejected for "specific and legitimate reasons supported by substantial evidence in the record." Lester v. Chater, 81 F.3d 821, 830 (9th Cir., as amended Apr. 9, 1996) (citation omitted).

Here, the ALJ rejected the opinions of treating physicians McSweeney, Madrid and Maloff. Concerning Dr. McSweeney, the ALJ stated that "the findings in the medical records from Dr. McSweeney . . . do

not fully corroborate with Dr. McSweeney's assessment that the claimant is unable to perform work."   (AR 29).   On the Multiple Impairment Questionnaire, Dr. McSweeney determined that Plaintiff could sit for three hours in an eight-hour workday, could stand or walk for three hours in an eight-hour workday, would have to be absent from work at least three days per month and is unable to do a full time competitive job.   (AR 740, 743-44).   Dr. McSweeney also diagnosed Plaintiff's right shoulder with an impingement, rotator cuff tendinosis and labral tear. (AR 738).   Dr. McSweeney assessed that Plaintiff's left shoulder suffers from a bicep tendon tear, rotator cuff tear, labral tear, adhesive capsulitis, chronic cervical sls and DPD.   (Id.).   Dr. McSweeney found that Plaintiff's right elbow has lateral epicondylitis. (Id.).

To come to these conclusions, Dr. McSweeney relied on objective medical tests, such as a right shoulder MRI from June 24, 2010, nerve studies from June 18, 2010, a left shoulder MRI from March 5, 2007 and intra-operative findings from the last surgery he performed on Plaintiff on July 22, 2009.   (AR 739).   The right shoulder MRI from June 2010 revealed tendinosis of the rotator cuff and tears in the posterosuperior and posterior labrum.   (AR 665).   The left shoulder MRI from March 2007 showed a rotator cuff tear, anterior labral tear, biceps tendon tear, acromioplasty and glenohumeral joint effusion.   (AR 322).   Dr. McSweeney's postoperative findings from the July 2009 surgery detailed that Plaintiff suffers from a labrum tear and rotator cuff tear.   (AR 580).   These findings corroborate Dr. McSweeney's diagnosis of Plaintiff.   Accordingly, the proffered reason for rejecting Dr. McSweeney's opinions was not "legitimate" because it is contrary to the record.

1    Furthermore, although the ALJ rejected Dr. McSweeney's opinions,
2 the ALJ accepted the determinations of Dr. Chesler, another treating
3 physician for Plaintiff.  The ALJ gave Dr. Chesler's assessments "great
4 weight . . . because his findings are consistent with the medical
5 records as a whole."  (AR 29).  However, Dr. Chesler on his Multiple
6 Impairment Questionnaire came to the same conclusion as Dr. McSweeney,
7 i.e., that Plaintiff could not perform work in a competitive
8 environment.  (AR 840).  Dr. Chesler, like Dr. McSweeney, also
9 determined that Plaintiff would have to be absent from work more than
10 three times per month.  (AR 841).  Moreover, Dr. Chesler determined that
11 Plaintiff was more limited than Dr. McSweeney opined, finding that
12 Plaintiff cannot sit or stand for more than one hour at a time during an
13 eight-hour work day.  (AR 837).  As the ALJ found Dr. Chesler's findings
14 to be consistent with the medical records, the ALJ should have fully
15 credited Dr. McSweeney's opinions because many of the findings of these
16 doctors were the same.

17

18    The ALJ also stated that she rejected the opinions of Dr. McSweeney
19 because he "examined the claimant solely in the context of a worker's
20 compensation claim."  (AR 29).  The ALJ's reasoning is not well founded
21 for two reasons.  First, the ALJ's reason for rejecting the treating
22 doctor's opinion is not legitimate under controlling authority.  Indeed,
23 "[t]he purpose for which medical reports are obtained does not provide
24 a legitimate basis for rejecting them."  Lester, 81 F.3d at 832.
25 Second, the ALJ's reason for rejecting Dr. McSweeney, i.e., the doctor's
26 worker's compensation purpose, is undermined by the fact that the ALJ
27 accepted the findings of "worker's compensation physician" Dr. Dhalla.
28 (Id.).  Thus, this proferred reason cannot be considered "legitimate".

21

1    Regarding Dr. Madrid, the ALJ rejected his opinions because a
2  "restrictive residual functional capacity is not supported by the
3  medical records as a whole." (AR 29).  Dr. Madrid determined on the
4  Multiple Impairment Questionnaire that Plaintiff could not sit or stand
5  for more than thirty minutes at one time during an eight-hour workday
6  due to his low back pain.  (AR 634).  Dr. Madrid also came to the same
7  accepted conclusion of Dr. Chesler that Plaintiff could not do a full
8  time job.  (AR 637).  Dr. Madrid also diagnosed Plaintiff with severe
9  depression due to chronic pain from work related injuries.  (AR 632).
10 He assessed memory loss associated with depression in reference to a
11 neurology consult which revealed dementia. (Id.).

12

13    Dr. Madrid's diagnosis was based upon Dr. Madrid's 2008 and 2009
14 assessments of Plaintiff in which he determined that Plaintiff suffered
15 from memory loss, depression, anxiety, lower back pain, spina bifuda and
16 degenerative disc disease.  (AR 446, 448-49, 470).  Dr. Madrid's
17 determinations are consistent with Drs. Abshire, Alvarez and Landau.
18 Dr. Abshire found that Plaintiff suffers from spina bifida.  (AR 613).
19 Dr. Alvarez determined that Plaintiff has memory loss and depression.
20 (AR 598).  Dr. Landau assessed degenerative disc disease and low back
21 pain.  (AR 50).  Therefore, Dr. Madrid's findings are supported by the
22 medical record and the ALJ did not provide legitimate reasons for
23 rejecting them.

24

25    Concerning Dr. Maloff, the ALJ rejected his evaluation of Plaintiff
26 because he failed to provide objective evidence for his conclusions
27 concerning Plaintiff's limitations.  (AR 30).  The ALJ explained that
28 Dr. Maloff's conclusions contained in the Psychiatric/Psychological

1  Impairment Questionnaire were unsupported by objective evidence because
2  of the "checklist style format" of the questionnaire.  (AR 30).  The
3  findings detailed in a checklist form can only be rejected by the ALJ
4  when the determinations do not "contain any explanation of the bases of
5  their conclusions." Crane v. Shalala, 76 F.3d 251, 253 (9th Cir. 1996).
6  Here, Dr. Maloff provided objective medical evidence in his Initial
7  Treating Physician's Evaluation of Plaintiff which consists of seven
8  pages of findings in paragraph format.  (AR 653-59).  These
9  determinations are consistent with and embellish the findings in the
10 Psychiatric/Psychological Impairment Questionnaire.  Further, the ALJ
11 rejected Dr. Maloff's opinions because he evaluated Plaintiff in regards
12 to a worker's compensation case.  (AR 31).  As discussed above, Dr.
13 Maloff's findings cannot be disregarded simply because they were made in
14 connection with a worker's compensation claim.  See Lester, 81 F.3d at
15 832. Consequently, the ALJ's decision does not provide a legitimate
16 reason supported by case law.

17

18     The ALJ also rejected the opinions of treating physicians
19 McSweeney, Madrid and Maloff because they were inconsistent with "other
20 medical opinions contained in the record." (AR 31).  The ALJ relied on
21 the opinions of consultative doctors Landau, Sophon and Pierce who
22 determined that Plaintiff could do light work.  (AR 55, 544, 551).
23 However, these opinions are not factually sound.  For example, when Dr.
24 Sophon examined Plaintiff, he was unable to perform a complete
25 evaluation because Plaintiff's left shoulder was in an immobilizer from
26 his recent surgery in July 2009.  (AR 542).  Also, when Dr. Pierce
27 performed a psychiatric evaluation of Plaintiff, he was the only doctor
28 to find that Plaintiff was malingering.  (AR 551).  In contrast, Drs.

Maloff, McSweeney, Madrid, Chesler, Alvarez and Wachtmann all found that Plaintiff suffered from depression, as well as suicidal thoughts and memory loss.  (AR 598, 632, 669, 743, 746, 840).  Even Dr. Landau, the medical expert whose testimony the ALJ accepted, found that Plaintiff had "psychiatric diagnoses."  (AR 50).

"To say that medical opinions are not supported by sufficient objective findings or are contrary to the preponderant conclusions mandated by the objective findings does not achieve the level of specificity our prior cases have required." Embrey v. Bowen, 849 F.2d 418, 421 (9th Cir. 1988).  Because the ALJ has failed to provide specific and legitimate reasons for rejecting Plaintiff's treating physicians' opinions, those opinions must be fully credited. Lester, 81 F.3d at 834 ("Where the Commissioner fails to provide adequate reasons for rejecting the opinion of a treating or examining physician, we credit that opinion 'as a matter of law.'").  If those opinions are fully credited, an award of benefits is required.  Id.

**B.    The ALJ Failed To Provide Clear And Convincing Reasons For Rejecting Plaintiff's Credibility**

The ALJ may reject a plaintiff's testimony if he or she makes an explicit credibility finding that is "supported by a specific, cogent reason for the disbelief." Rashad v. Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990) (internal citations omitted).  Unless there is affirmative evidence showing that the plaintiff is malingering, the ALJ's reasons for rejecting the plaintiff's testimony must be "clear and convincing." Lester, 81 F.3d at 834.  Moreover, the ALJ may not discredit a

24

1  claimant's testimony of pain and deny disability benefits solely because
2  the degree of pain alleged by the claimant is not supported by objective
3  medical evidence.  Bunnell v. Sullivan, 947 F.2d 341, 346-47 (9th Cir.
4  1991).   If  the  ALJ  finds  the  claimant's  pain  testimony  not  to  be
5  credible, the ALJ "must specifically make findings that support this
6  conclusion."  Rollins v. Massanari, 261 F.3d 853, 856 (9th Cir. 2001)
7  (citation omitted). If the ALJ only makes vague findings, i.e., the
8  plaintiff's statements are not consistent with the medical evidence, the
9  ALJ  has  not  satisfied  his  obligation  to  supply  specific,  clear,  and
10 convincing reasons.  Vasquez v. Astrue, 572 F.3d 586, 592 (9th Cir.
11 2009).

12

13     The ALJ pointed to two doctor evaluations in finding that Plaintiff
14 lacked credibility.   The ALJ first relied on the evaluation of Dr.
15 Pierce, a psychological consultant for the Agency. (AR 32).  Dr. Pierce
16 assessed  that  Plaintiff  was  malingering.   (AR  551).   However,  as
17 discussed above, Dr. Pierce was the only doctor to make that finding
18 which was contradicted by seven other doctors.  (AR 50, 551, 598, 632,
19 669, 743, 746, 840).   These doctors included Dr. Landau, upon whose
20 opinions the ALJ relied.  (AR 32).  Because the vast weight of the
21 evidence did not support Dr. Pierce's conclusion regarding malingering,
22 the ALJ should not have relied upon it.   The ALJ cannot "reach a
23 conclusion first, and then attempt to justify it by ignoring competent
24 evidence in the record that suggests an opposite result."  Gallant v.
25 Heckler, 753 F.2d 1450, 1455-56 (9th Cir. 1984).  See also Reddick v.
26 Chater, 157 F.3d 715, 722-23 (9th Cir. 1998) (impermissible for ALJ to
27 develop evidentiary basis by "not fully accounting for the context of
28 materials or all parts of the testimony and reports").  Here, the ALJ

failed to acknowledge that the vast majority of doctors evaluations were consistent with Plaintiff's subjective complaints.  As the malingering conclusion is not supported by the record, the ALJ was required to provide clear and convincing reasons for rejecting Plaintiff's credibility.

The second evaluation upon which the ALJ relied was completed by Dr. Alvarez.  (AR 30).  There is a comment on the evaluation from January 2010 that Plaintiff had not made an appointment with a psychiatrist for depression treatment.  (AR 604).  The ALJ found this "demonstrates a possible unwillingness to do what is necessary to improve his condition" or that "his symptoms are not as severe as he purports."  (AR 30).  However, it is noteworthy that Dr. Alvarez also stated on that same evaluation that Plaintiff was returning to his primary physician for a referral to a psychiatrist.  (AR 604).  After that evaluation, Plaintiff did consult with Dr. McSweeney, his primary physician, who referred Plaintiff to Dr. Maloff, a psychiatrist.  (AR 641, 653).  Plaintiff began regularly meeting with Dr. Maloff in May 2010.  (AR 653).  Thus, the ALJ's proferred reason was not a "clear and convincing reason" for rejecting Plaintiff's credibility as it is inconsistent with the totality of the evidence.

The ALJ also found that Plaintiff's ability to perform daily activities "undermined the credibility of [Plaintiff's] allegations of functional limitations."  (AR 27).  The ALJ explained that the "physical and mental abilities required to perform the above-described activities of daily living are the same as those necessary for obtaining and maintaining employment."  (Id.).  Plaintiff's daily activities include

26

taking medication for pain and depression, watching television, eating, some walking and sleeping.  (AR 59).  Plaintiff is able to bathe and dress himself but is not able to assist his family with housework, yard work or cooking.  (Id.).  When Plaintiff is feeling well enough, he will attend church twice a month.  (AR 60).  Plaintiff goes to the pharmacy for his medications one to two times per week.  (AR 172).

"This court has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from [the plaintiff's] credibility as to [the plaintiff's] overall disability."  Vertigan v. Halter, 260 F.3d 1044, 1050 (9th Cir. 2001).  Indeed, a plaintiff does not need to be "utterly incapacitated to be eligible for benefits."  Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989).  The degree of activity described by Plaintiff was not so extensive that it undermined his pain testimony.  Accordingly, Plaintiff's daily activities were not a "clear and convincing" reason to reject his testimony.

Thus, the ALJ failed to provide clear and convincing reasons, supported by the record, to reject Plaintiff's testimony.  Accordingly, remand is required and full credit must be given to Plaintiff's testimony.  Again, if Plaintiff's testimony is fully credited, an award of benefits is appropriate.  See Lester, 81 F.3d at 834.

\\

\\

\\

**C.   The ALJ's Literacy Finding Was Flawed Because She Failed To**
     **Determine If Plaintiff If Could Read Or Write In English**

The Medical-Vocational Guidelines, or "grids," are rules that direct findings of "disabled" or "not disabled."  The grids are based on vocational factors, such as age, education and work experience, as well as the plaintiff's RFC determination.  20 C.F.R., Part 404, Subpart P, Appendix 2 § 200.00(a).  If the plaintiff "suffers from both exertional and non-exertional limitations, the ALJ must consult the grids first." Lounsburry v. Barnhart, 468 F.3d 1111, 1115 (9th Cir. 2006).  "[W]here application of the grids directs a finding of disability, that finding must be accepted by the Secretary." Cooper v. Sullivan, 880 F.2d 1152, 1157 (9th Cir. 1989).

The ALJ determined at step five that if Plaintiff had the RFC to perform light work, a finding of not disabled would be required by Medical-Vocational Rules 202.17 and 202.10.  (AR 33).  The ALJ stated, "[h]owever, the claimant's ability to perform all or substantially all of the requirements of this level of work was impeded by additional limitations," so the ALJ did not ultimately rely upon the grids.  (Id.). However, even her statement above regarding Rules 202.17 and 202.10 is flawed.

Medical-Vocational Rule 202.10 directs a finding of not disabled when a person is closely approaching advanced age, has previous unskilled work experience and has limited education but is at least literate and able to communicate in English.  Because Plaintiff was fifty-one years old at the time of the ALJ decision, Plaintiff falls

1  into the "closely approaching advanced age" category (age 50-54).   See
2  20 C.F.R. § 404.1536(b); Lockwood v. Comm'r of Social Sec. Admin., 616
3  F.3d 1068, 1072 (9th Cir. 2010) (the plaintiff's age at the date of the
4  ALJ decision is the age applied for the Medial-Vocational age
5  categories).   However, Medical-Vocational Rule 202.09 pertains to a
6  person with the same characteristics as Rule 202.10 with the exception
7  of being illiterate or unable to communicate in English.   Under such
8  circumstances, Rule 202.09 directs a finding of disabled.   Therefore,
9  the issue of Plaintiff's literacy would be critical to any application
10 of the grids.

11

12     It is the ALJ's burden to determine if Plaintiff is literate.
13 Silveira v. Apfel, 204 F.3d 1257, 1261-2 (9th Cir. 2000).   The ALJ
14 determined here that Plaintiff "was able to answer questions at the
15 hearing before the interpreter could interpret the questions." (AR 27).
16 Also, Plaintiff "had notes written in English, in which the claimant's
17 representative read the claimant's notes into the record."   (Id.).
18 These notes included a list of surgeries and their respective dates
19 written in English.   (AR 63-64).   The ALJ asked Plaintiff if he was able
20 to write in English and his response was "[a] little bit yes, but I
21 don't write it -- I write it in my form of Spanish." (AR 64).   The ALJ
22 concluded that Plaintiff could "communicate in English."   (AR 33).

23

24     However, illiterate has been defined as the "inability to read or
25 write" in English.   Silveira, 204 F.3d at 1261.   Literacy in other
26 languages is not considered.   Chavez v. Dep't of Health and Human Serv.,
27 103 F.3d 849, 852 (9th Cir. 1996); 20 C.F.R. § 416.964(b)(5).

28

1     Here, there is no clear proof that Plaintiff can read or write in
2  English.  Plaintiff testified that he is able to speak some English and
3  the ALJ noted that Plaintiff did not always need an interpreter.  (AR
4  27, 48).  However, speaking English does not pertain to his literacy
5  ability in reading and writing.  When asked if Plaintiff can write in
6  English, Plaintiff stated, "[a] little bit yes, but I don't write it --
7  I write it in my form of Spanish."  (AR 64).  Plaintiff required his
8  attorney to read the list of surgeries written in English into the
9  record.  (AR 63).  Plaintiff also required an interpreter at the ALJ
10 hearing and at medical examinations with Dr. Dhalla and Alvarez.  (AR
11 42, 604, 845).  Further, Dr. Madrid specifically referred Plaintiff to
12 Dr. Alvarez because she was primarily a Spanish speaker.  (AR 446).
13 Thus, the ALJ did not meet her burden of finding that Plaintiff was
14 literate.

15

16     This issue is somewhat irrelevant as the ALJ proceeded to call a
17 vocational expert ("VE") to testify.  There are independent problems
18 with the VE's testimony, as discussed below.  However, the Court
19 addresses the literacy issue because the parties raised the issue in
20 their briefs.  Nonetheless, because the Court finds that Plaintiff is
21 entitled to an award of benefits, this issue does not affect the outcome
22 here.

23

24 **D.   The VE Testimony Upon Which The ALJ Relied Was Inconsistent With**
25      **the DOT**

26

27     In order for the VE's testimony to constitute substantial evidence,
28 the hypothetical question posed must "consider all of the claimant's

1  limitations." <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1044 (9th Cir. 1995).
2  "[T]he ALJ, however, may rely on expert testimony which contradicts the
3  DOT, but only insofar as the record contains persuasive evidence to
4  support the deviation." <u>Light v. Social Sec. Admin.</u>, 119 F.3d 789, 793
5  (9th Cir. 1997) (citation omitted).  The ALJ cannot deviate from the DOT
6  without explanation to find that Plaintiff is capable of performing the
7  jobs posed by the VE when these jobs mandate requirements that are
8  inconsistent with the plaintiff's documented impairments, such as his
9  literacy.  <u>Light</u>, 119 F.3d at 793.

11      The ALJ found that Plaintiff was not disabled because the VE
12  testified that Plaintiff could perform three jobs: a parking lot booth
13  attendant, electronics worker and sewing machine operator.  (AR 67).
14  The VE also stated that if Plaintiff could not speak, read or write
15  English, Plaintiff would not be able to work as a parking lot booth
16  attendant, but would still be able to work as an electronics worker or
17  sewing machine operator.  (AR 67-68).

19      The VE's findings are contrary to the DOT.  Under the DOT, the
20  requirements for a parking lot booth attendant are a language level of
21  1, the lowest level.  DICOT 915.473-010.  At level 1, it is expected
22  that the worker can recognize the meaning of 2,500 two or three-syllable
23  words; read at the rate of 95-120 words per minute; compare similarities
24  and differences between words and between series of numbers; print
25  simple sentences containing subject, verb, and object; print series of
26  numbers, names, and addresses; and speak simple sentences using normal
27  word order, present tense and past tense.  <u>Id.</u>  Further, these
28  requirements must be completed in English.  See <u>Pinto v. Massanari</u>, 249

1 F.3d 840, 848 n. 2 (9th Cir. 2001).  Without being literate in English,

2 Plaintiff would not be able to fulfill these job requirements.  While

3 this finding is consistent with the VE's determination that Plaintiff

4 could not work as a parking lot booth attendant, it is inconsistent with

5 the VE's finding that Plaintiff could work as an electronics worker or

6 sewing machine operator.  (AR 67-68).  These jobs have an even higher

7 language requirement of level 2.  DICOT 726.687-010 ("Electronics Worker

8 - Reasoning:Level 2; Language: Level2 - Reading; Writing: Write compound

9 and complex sentences"), DICOT 787.685-010 (Fastener-Sewing Machine

10 Operator - Reasoning: Level 2; Language: Level 2 - Reading; Writing:

11 Write compound and complex sentences").  Accordingly, if Plaintiff would

12 not have the literacy level to complete a level 1 job, he would not have

13 the English language ability to complete a level 2 job nor would he

14 possess the reading and writing skills set forth in the DOT for these

15 positions.

16

17 As there was no testimony provided to explain these discrepancies,

18 it was error for the ALJ to rely on the vocational expert's testimony.

19 Significantly, if the treating doctors' opinions are fully credited,

20 then according to the VE, Plaintiff would not be able to perform any

21 work.  (See AR 68-9).

22

23 **E.    Remand For An Award Of Benefits**

24

25 While this Court may remand for further proceedings, it may also

26 remand for an award of benefits if "the record is fully developed and it

27 is clear from the record that the ALJ would be required to award

28 benefits."  Holohan v. Massanari, 246 F.3d 1195, 1210 (9th Cir. 2001).

1  In order for Plaintiff to obtain disability benefits, he must
2  demonstrate that he was disabled prior to his last insured date.
3  Armstrong v. Comm'r of Social Sec. Admin., 160 F.3d 587, 589 (9th Cir.
4  1998). Further, Plaintiff will be considered disabled when he "became
5  unable to engage in any substantial gainful activity by reason of any
6  medically determinable physical or mental impairment which can be
7  expected to last for a continuous period of not less than twelve
8  months." Armstrong, 160 F.3d at 589 (punctuation and citation omitted).
9  "Factors relevant to the determination of the disability onset include
10  the individual's allegation, the work history, and the medical
11  evidence." Social Security Ruling 83-20 (1983).

13     Plaintiff was last insured on December 31, 2009. (AR 125).
14  Plaintiff stopped working on May 27, 2009. (Id.). Plaintiff has not
15  worked since 2009. (AR 124). Plaintiff explained that he stopped
16  working because he "had operations and [he] just couldn't take any more
17  of the pain." (AR 46). Plaintiff testified that it is the pain and his
18  depression that keeps him from working. (AR 46, 62).

20     Doctors who examined Plaintiff after he stopped working in May 2009
21  all noted that it was unlikely Plaintiff's depression and memory loss
22  would improve. Dr. McSweenney stated that Plaintiff "has a chronic
23  condition and will not improve. To some degree it has worsened." (AR
24  744). Dr. Abshire found that more surgeries would be ineffective
25  because "the chance of making [Plaintiff] better and substantially
26  better is low." (AR 608). Concerning Plaintiff's mental state since
27  ending his employment in May 2009, Dr. Alvarez in June 2009 diagnosed
28  Plaintiff with pseudo-dementia, progressive cognitive decline and

1   depression.   (AR 317, 598).   Dr. Chesler determined that Plaintiff

2   suffers from "depression due to job income loss." (AR 840).

3

4        Two psychiatrists, Dr. Maloff and Dr. Wachtmann, further elaborated

5   on Plaintiff's increase in depression and suicidal thoughts arising from

6   his inability to work.  Dr. Maloff determined that Plaintiff is severely

7   depressed by the inability to be a provider for his family.

8   (AR 654, 656).   Dr. Wachtmann assessed that Plaintiff has severe

9   depression due to a sense of worthlessness.  (AR 751).   Plaintiff's

10  "physical inability to work significantly exacerbates his depression."

11  (AR 753).        Further, Dr. Wachtmann completed two

12  Psychiatric/Psychological Impairment Questionnaires. (AR 746, 894).  In

13  the second questionnaire completed three months after the first, Dr.

14  Wachtmann noted that Plaintiff's conditions had worsened.  (Compare AR

15  741 to AR 895).

16

17       The Court finds that an award of benefits is appropriate here.

18  After considering the relevant factors, Plaintiff's correct disability

19  onset date is May 27, 2009.  Plaintiff testified that this was the last

20  day he worked.  (AR 63).  Plaintiff also listed May 27, 2009 as his last

21  date employed in the disability report.  (AR 129).  Dr. Sophon noted in

22  his evaluation that this was the last day of Plaintiff's employment.

23  (AR 541).  Further, Plaintiff did not earn an income in 2010 and Dr.

24  Dhalla reported that Plaintiff was not working when he evaluated

25  Plaintiff in 2010.   (AR 124, 847).   Plaintiff's treating physicians'

26  opinions as well as Plaintiff's testimony should be fully credited, and

27  therefore Plaintiff must be found disabled from May 27, 2009.

28  //

# VIII.

## CONCLUSION

Consistent with the foregoing, IT IS ORDERED that judgment be entered REVERSING the decision of the Commissioner and REMANDING this matter for payment of benefits, consistent with this decision.  IT IS FURTHER ORDERED that the Clerk of the Court serve copies of this Order and the Judgment on counsel for both parties.

DATED: August 23, 2012.


                                    /S/
                                    _____
                                    SUZANNE H. SEGAL
                                    UNITED STATES MAGISTRATE JUDGE

35